*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. M. SCHOFIELD-ROOSE, Minor.

UNPUBLISHED
January 14, 2026
2:30 PM

No. 375722
Wayne Circuit Court
Family Division
LC No. 2021-000718-NA

Before: GADOLA, C.J., and REDFORD and RICK, JJ.

PER CURIAM.

Respondent-appellant-father appeals as of right the trial court order terminating his parental rights to the minor child, ASR, under MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions), (h) (parent imprisoned for such a period that child would be deprived of a normal home for more than two years), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BASIC FACTS AND PROCEDURAL POSTURE

In 2021, the Department of Health and Human Services ("the DHHS") petitioned the trial court to remove ASR from his mother's care after he tested positive for amphetamines and heroin at birth.[1] The trial court authorized the petition, and ASR was placed in his maternal grandmother's care. Respondent was incarcerated and considered ASR's putative father when ASR was born. Respondent was later found to be ASR's legal father, and the trial court took jurisdiction over ASR, as to respondent, on August 25, 2023. Respondent was ordered to comply with a Parent-Agency Treatment Plan ("the treatment plan"), and the DHHS made referrals for the necessary services. The treatment plan required respondent to participate in the following services: parenting classes, individual therapy, substance abuse therapy, anger management, infant mental health services, and weekly drug screens; to undergo a psychological evaluation; to maintain suitable

---

[1] Ultimately, mother's parental rights to ASR were terminated in 2023. ASR's mother is not a party to this appeal.

housing and a legal source of income; to attend visitations; and to comply with foster care caseworkers.

Respondent participated in substance abuse and parenting courses while he was incarcerated until his release in October 2023. After his release, respondent became noncompliant with his treatment plan and used methamphetamine. Respondent was arrested in April 2024 for possession or distribution of illegal substances, carrying a concealed weapon, parole violations, and resisting or obstructing arrest. He was sentenced to 8 to 20 years in prison, with an earliest release date in June 2032. The DHHS terminated the services in the treatment plan following respondent's reincarceration. However, the DHHS continued to inquire into possible services available to respondent in prison, but could not contact anyone at the facility.

On November 5, 2024, DHHS petitioned the trial court to terminate respondent's parental rights for failing to comply with or benefit from the treatment plan and because of the length of his incarceration. A termination hearing was held on March 14, 2025. At the hearing, testimony established that respondent failed to complete individual therapy, substance abuse treatment, anger management classes, and a psychological evaluation. Furthermore, respondent failed to complete 27 of 33 drug screenings and tested positive for methamphetamines, amphetamines, and marijuana on several occasions while on parole. Additionally, respondent missed 27 of 33 visitations with ASR. Of the six visitations he did attend, one ended early because respondent started falling asleep due to suspected drug use. During another visit, respondent tested positive for methamphetamine and marijuana. Moreover, no bond appeared to exist between ASR and respondent during the visits. Testimony regarding respondent's substance abuse established that his drug use started at age nine. When testimony concluded, the referee found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*ii*), (h), and (j). The referee reasoned that after respondent was released from prison in October 2023 until his arrest in April 2024, he failed to comply with the treatment plan. The trial court ultimately signed an order adopting the referee's recommendation. This appeal followed.

## II. REASONABLE EFFORTS

Respondent first argues that the trial court erred by terminating his parental rights because the DHHS failed to make reasonable efforts toward reunification after he became imprisoned.[2] We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

---

[2] We note respondent's appellate briefing regarding reasonable efforts is inadequate. He does not provide any legal authority in support of his argument that the DHHS did not provide reasonable efforts toward reunification. "It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted). Because of respondent's failure to adequately brief this issue, we need not address it. *Id.* Nevertheless, we address respondent's argument for the sake of completeness.

A parent must preserve his argument that the DHHS failed to make reasonable efforts toward reunification by "object[ing] or indicat[ing] that the services provided to [him] were somehow inadequate . . . ." *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). "The time for asserting the need for accommodation in services is when the court adopts a service plan" or "soon afterward." *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022) (quotation marks and citation omitted). "However, even if a parent does not object or otherwise indicate that the services provided were inadequate when the initial case services plan is adopted, such an objection or challenge may also be timely if raised later during the proceedings." *Id*. at 337. This is because "services that are adequate at the beginning of the case may become inadequate as the case proceeds." *Id*. Therefore, a respondent must be afforded "multiple opportunities to, as the circumstances change, object to the adequacy of the services being provided." *Id*. at 337-338.

In the lower court proceedings, respondent's counsel frequently argued that he was making progress and benefiting from the services provided. Respondent became reincarcerated in April 2024 and his parental rights were not terminated until March 2025. Respondent's counsel did not object that the services provided were inadequate until the termination hearing. Because respondent did not raise this issue in the trial court in a timely manner, it is unpreserved.

Generally, this Court reviews for clear error the trial court's decision whether reasonable reunification efforts were made. See *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). However, because this issue is unpreserved, we review for plain error affecting substantial rights. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). In order to avoid forfeiture under the plain-error rule, three requirements must be met: (1) the error must have occurred; (2) the error was plain, i.e., clear or obvious; and (3) the plain error affected substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). An error affects substantial rights "if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008). Reversal is appropriate only if the plain error "seriously affect[ed] the integrity, fairness, or public reputation" of the proceedings. *In re Mota*, 334 Mich App 300, 311; 964 NW2d 881 (2020).

## B. ANALYSIS

Absent certain exceptions inapplicable to this case, "the [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). To make reasonable efforts, the DHHS adopts a service plan aimed at rectifying the conditions that caused the child's removal. *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). See also MCL 712A.18f(3)(d) (stating that the service plan shall include a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home"). Although the DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of [the respondent] to participate in the services that are offered" and "demonstrate that [he or she] sufficiently benefited from the services provided." *In re Frey*, 297 Mich App at 248.

Respondent's arguments focus on his assertion that the DHHS failed to provide services once he became reincarcerated. In this case, respondent's barriers to reunification included substance abuse; emotional instability; and lack of parenting skills, suitable housing, and a legal

-3-

source of income. Respondent received a treatment plan in August 2023. The treatment plan included parenting classes, individual therapy, substance abuse therapy, anger management, infant mental health services, and weekly drug screenings to address respondent's barriers.

Although respondent initially completed parenting and substance abuse courses during his first incarceration, he failed to fully participate and benefit from services as apparent from his conduct after he was released from jail in October 2023. Between his release and his reincarceration in April 2024, respondent missed 29 of 33 random drug screens. Of the drug screenings he participated in, he tested positive for methamphetamine and amphetamine. Respondent failed to complete individual therapy, substance abuse treatment, an anger management course, and a psychological evaluation in that time. Respondent also missed 27 of 33 visitations with ASR. Caseworkers suspected he was using methamphetamine during visits, as indicated by the fact that respondent fell asleep during a visit and tested positive for methamphetamine during another visit. Ultimately, respondent's continued drug use led him to become reincarcerated for possession or distribution of illegal substances, carrying a concealed weapon, parole violations, and resisting or obstructing arrest.

After respondent became reincarcerated, the DHHS could no longer provide the services he was previously provided. However, his caseworker continued to seek services for him in prison. Starting in April 2024, respondent was incarcerated in the Charles Egeler Reception and Guidance Center and later transferred to another prison in December 2024. Apparent from the record, respondent's caseworker was able to contact staff when respondent was housed in Egeler. However, because Egeler was a transfer center, services were unavailable to inmates held in the facility while they were processed to transfer to a prison. Additionally, the caseworker sought to continue parenting time visits via video conference; however, under Egeler's policy, the DHHS could not pay for video conferencing. Instead, respondent was required to pay for video conferencing if he wanted to use the service, which he did not do. When respondent was transferred to another prison, respondent's caseworker attempted to contact prison staff to determine the services available to respondent, but did not receive any response.

Given this record, the lack of services available to respondent during his second incarceration was not because of a lack of effort from the DHHS. Rather, it is evident that respondent received numerous services to address his barriers to reunification. However, respondent failed to complete and benefit from those services, either because he failed to attend or because he could no longer attend once he became reincarcerated. These failures were attributable to his own actions of continuing to engage in substance abuse and criminal activity. Therefore, although there is evidence that respondent participated in some services early in the proceedings, the record supports that respondent did not fulfill his "commensurate responsibility" to participate and benefit from the services offered. See *id*. The trial court did not plainly err by finding reasonable efforts were made in this case. *In re VanDalen*, 293 Mich App at 135.

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent next argues the trial court erred by finding statutory grounds to terminate his parental rights because he initially complied with his treatment plan and a relative was caring for ASR. We disagree.

To terminate parental rights, a trial court must find that clear and convincing evidence established a statutory ground warranting termination. *In re Mota*, 334 Mich App at 320. The trial court's findings and rulings regarding statutory grounds are reviewed for clear error. *Id*. "A finding . . . is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed . . . ." *Id*. (citation and quotation marks omitted; omission in original). This Court gives regard to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. *Id*.

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*ii*), (h), and (j). These statutory grounds state as follows:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (h) The parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent. [MCL 712A.19b(3)(c)(*ii*), (h) and (j).]

If this Court holds that the trial court properly concluded that one statutory ground existed for termination, this Court need not address the additional grounds for termination. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

In this case, clear and convincing evidence established grounds for terminating respondent's parental rights under MCL 712A.19b(3)(h). "The mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for

termination." *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010). Rather, grounds for termination under MCL 712A.19b(3)(h) are met only if each of the three conditions in the statute are met. *In re Baham*, 331 Mich App 737, 753; 954 NW2d 529 (2020). The first two requirements under MCL 712A.19b(3)(h) permit "a parent to provide for a child's care and custody although the parent is in prison; he need not personally care for the child." *In re Mason* 486 Mich at 161 (emphasis omitted). A parent can provide proper care and custody through a relative. *Id*. at 161. The third requirement "is forward-looking; it asks whether a parent 'will be able to' provide proper care and custody within a reasonable time. Thus, a parent's past failure to provide care because of his incarceration also is not decisive." *Id*. at 161. The two-year period in which a court considers whether a child will be deprived of a normal home is calculated from the date termination is sought, rather than the date the parent's incarceration began. See *id*. at 162.

Regarding the first element, respondent was convicted of possession or distribution of illegal substances, carrying a concealed weapon, parole violations, and resisting or obstructing arrest in 2024. At the time of the termination hearing, respondent was already incarcerated and serving a sentence of 8 to 20 years' imprisonment. His earliest release date was in June 2032, which is well over the two-year statutory period provided in MCL 712A.19b(3)(h). Additionally, respondent has no guarantee of being granted parole in 2032. Consequently, the evidence demonstrated respondent was incarcerated for a period exceeding two years such that ASR would be deprived of a normal home. See MCL 712A.19b(3)(h).

Next, regarding whether respondent provided for ASR's proper care and custody, respondent does not specifically cite *Mason*, but his argument appears to rely on the proposition that "Michigan traditionally permits a parent to achieve proper care and custody through placement with a relative." *In re Mason*, 486 Mich at 161 n 11. In *Mason*, the evidence showed that the children's mother arranged for them to be cared for by the respondent-father's family, who were "presumably the very people with whom [the respondent-father] would have voluntarily placed them had the DHHS not already taken custody of them by the time respondent was notified of [the mother's] neglect." *Id*. at 163-164. For that reason, the respondent-father did not need "to make ongoing arrangements with the relatives that would permit him to preserve his rights and remain in contact with his sons." *Id*. at 164.

Unlike *Mason*, ASR was placed with his maternal grandmother, who is not a relative of respondent, before respondent was established to be ASR's legal father. ASR was placed in his grandmother's care in 2021 based on his mother's substance abuse. At that time, respondent was incarcerated and had not met ASR, but believed he was the putative father. ASR remained in his grandmother's care throughout the lower court proceedings even after respondent established paternity and was released from his first incarceration. There is no indication that respondent suggested the maternal grandmother should be ASR's caregiver. Instead, respondent appears to have merely conceded to the maternal grandmother caring for ASR. Further, the record does not indicate that respondent had any plans for other feasible relative placements. For these reasons, the facts of this case are readily distinguishable from *Mason*, and there is no presumption that respondent would have arranged for the maternal grandmother to care for ASR. Respondent had not made any arrangement with relatives that would "preserve his rights and remain in contact with [ASR]." *Id*.

Moreover, the record does not reflect that respondent otherwise provided monetary or emotional support for ASR during ASR's life. The record contained no evidence that after respondent was established to be ASR's legal father, he held gainful employment or provided financial support to ASR at any point. Likewise, respondent only met ASR after his first incarceration and did not take the time to develop a relationship with him. When respondent was between incarcerations, he only attended 6 of 33 parenting time visits. After he became reincarcerated, respondent's contact with ASR was limited to letters he occasionally wrote to him. Respondent faults the DHHS for failing to pay for video conferencing so that he could visit with ASR in prison; however, the record established that only respondent could pay for such video conferences and he failed to do so. As a consequence, ASR had no bond with respondent and there was no record evidence that respondent developed or maintained a relationship with ASR when given the opportunity. Therefore, the second condition that respondent had "not provided for [ASR's] proper care and custody" was established. MCL 712A.19b(3)(h).

Finally, regarding the third factor, there is no reasonable expectation respondent will be able to provide proper care and custody within a reasonable time considering ASR's age. Respondent appears to argue that his initial participation in services shows that he would be able to provide proper care for ASR. Although the record reflects that respondent participated in services in the early stages of the proceedings, this fact does not establish that respondent would be able to provider proper custody and care to ASR within a reasonable time. It is apparent respondent did not benefit from his early participation in services. After respondent was released, he ceased fully participating and benefiting from services. As already noted, respondent missed 27 of 33 visits with ASR, which demonstrated that respondent did not appreciate the importance of being a presence in ASR's life. Further, when respondent did participate in visits, the caseworkers suspected that respondent was using methamphetamine, an act which exposed ASR to drug use. Further, respondent missed 29 of 33 random drugs screenings and tested positive for methamphetamine and amphetamine on several occasions while on parole. Respondent's continued drug abuse, which started as early as age 9, demonstrated that he did not benefit from his substance abuse courses. Finally, respondent also failed to complete individual therapy, substance abuse treatment, an anger management course, and a psychological evaluation when he had the opportunity. Instead, respondent continued to engage in a pattern of behavior which ultimately led to his reincarceration. Given respondent's conduct and his failure to comply with and benefit from his treatment plan, the record evidence demonstrated that he could not develop the parenting skills necessary to provide proper care and custody for ASR within a reasonable time.

Respondent's earliest release date was in June 2032. At the time of the termination hearing, ASR was approximately three years old and spent the majority of his life in his grandmother's care. Given the considerable length of time respondent will remain incarcerated and his failure to show he could comply with or benefit from his treatment plan, there was no error in the trial court's conclusion that respondent was unlikely to provide proper custody and care for ASR within a reasonable time given his young age. The trial court did not clearly err in finding statutory grounds under MCL 712A.19b(3)(h) to terminate respondent's parental rights. Because at least one statutory ground existed to terminate his parental rights, we need not address the remaining grounds for termination. *In re HRC*, 286 Mich App at 461.

## IV. BEST INTERESTS

Finally, respondent argues that the trial court's decision to terminate his parental rights was not in ASR's best interests. We disagree.

Once a trial court finds that a single statutory ground for termination has been established, the trial court may terminate the respondent's parental rights if termination is in the child's best interests. *In re Mota*, 334 Mich App at 320. Whether termination of parental rights is in a child's best interests must be established by a preponderance of evidence. *Id.* The trial court's findings and ruling that termination is in the child's best interests are reviewed for clear error. *Id.*

In making a best-interest determination, the court's focus should be the child, not the parent. *In re Atchley*, 341 Mich App at 346. The trial court may consider the following factors when deciding whether termination serves the children's best interests: (1) the child-parent bond; (2) the parent's parenting capabilities; (3) the child's need for permanency, stability, and finality; and (4) advantages presented by a foster home relative to the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014). The child's placement with relatives is an additional, "explicit" factor for trial courts to consider in determining whether termination of a party's parental rights serves the child's best interests. *In re Mason*, 486 Mich at 164. Placement with relatives weighs against termination of parental rights. *Id.*

A preponderance of the evidence in the record supports the trial court's decision that termination of respondent's parental rights served ASR's best interests. ASR and respondent do not share a bond, and ASR does not appear to recognize respondent as his father. On the other hand, ASR and his grandmother share a strong bond. He shows her affection, asks for her assistance, and is comfortable with her. Moreover, ASR has been in his grandmother's care for his entire life, and respondent's incarceration could potentially span another two decades. The trial court correctly stated that ASR deserves permanency, stability, and finality in his grandmother's care during respondent's incarceration. Generally, a relative placement weighs against termination of parental rights. However, because ASR's grandmother does not wish to participate in a guardianship, termination is in ASR's best interests because her intent to adopt ASR will provide him with needed stability. Lastly, respondent's unwillingness or inability to comply with or benefit from the treatment plan demonstrates that respondent refuses to take the necessary steps to provide ASR with a safe home, which supports finding that termination is in ASR's best interests. Therefore, the trial court did not clearly err by finding that termination of respondent's parental rights was in ASR's best interests.

Affirmed.

/s/ Michael F. Gadola
/s/ James Robert Redford
/s/ Michelle M. Rick